UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LANCE WOOD, RENEE WOOD, and RODNEY SCHILLING,<br><br>    Plaintiffs,<br><br>vs.<br><br>PAUL PANTHER, MARK KUBINSKI, BRENT REINKE, ROBIN SANDY, OLIVIA CRAVEN, KEVIN KEMPF, WILLIAM FRUEHLING, RANDY BLADES, KEITH YORDY, ALAN STEWART, JAMES DU TOIT, KARA NIELSON, MATTHEW BUIE, MR. WILSON, and JOHN AND JANE DOES,<br><br>    Defendants. | Case No. 1:15-cv-00092-CWD<br><br>**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER** |

In the Initial Review Order, the Court determined that Plaintiffs Lance Wood, Renee Wood, and Rodney Schilling were required to clarify their pleadings because the claims in the original Complaint and Amended Complaint were unclear and disjointed. (Dkt. 12, p. 3.) To facilitate review of the case, each Plaintiff was ordered to file a separate, second amended complaint. (Id. at 6.) Non-prisoner plaintiffs Renee Wood and Rodney Schilling filed Second Amended Complaints. (Dkts. 21 & 22.) Plaintiff Rodney Schilling's action was severed from this one for reasons of judicial efficiency. (Dkt. 25.)

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 1**

In the Court's Order of August 22, 2016, Lance Wood was notified that he was required to resubmit his amended pleading and a copy of the prison mail log showing the date of his original submission to the Clerk of Court by September 23, 2016, or his claims would be subject to dismissal without further notice. Lance Wood has not filed a second amended complaint and mail log or anything further in this case.

Upon a review of Renee Wood's Second Amended Complaint, the Court determined that, despite the Court's detailed instructions for amendment, the pleading remained "vague, with every allegation implausibly pinned to every Defendant." (Dkt. 27, p. 2.) The Court ordered Renee Wood to supplement her Second Amended Complaint with additional factual allegations regarding: (1) when and to whom she engaged in speech that was critical of the IDOC and how each Defendant had notice of it; (2) particular allegations showing which activities that threatened to expose IDOC cronyism she engaged in and how each Defendant had notice of it; (3) which Defendants personally participated in destruction or interference of her mail between January 1, 2013 to June 18, 2013, with a description of the facts showing the personal participation of each.

Renee Wood has also filed a separate Demand for Jury Trial. (Dkt. 24.) It will be considered incorporated into her Second Amended Complaint.

The Court now reviews the Supplemental Complaint, together with the Second Amendment Complaint. (Dkts. 28, 21.)

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 2**

## REVIEW OF THE SECOND AMENDED COMPLAINT AND SUPPLEMENT

### 1. Standard of Law

The Court is required to review in forma pauperis complaints seeking relief against a governmental entity or an officer or employee of a governmental entity to determine whether summary dismissal is appropriate. 28 U.S.C. § 1915. The Court must dismiss a complaint or any portion that states a frivolous or malicious claim, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

A complaint fails to state a claim for relief under Rule 8 of the Federal Rules of Civil Procedure if the factual assertions in the complaint, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In other words, although Rule 8 "does not require detailed factual allegations," the Supreme Court clarified that "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (internal quotation marks omitted). If the facts pleaded are "merely consistent with a defendant's liability,"

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 3**

but lack a causal link or other element of a civil rights cause of action, the complaint has not stated a claim for relief that is plausible on its face. *Id.* (internal quotation marks omitted).

## 2. Background

Lance Wood (hereafter "Lance") is a Utah inmate with a life sentence who was housed at an Idaho prison operated by the Idaho Department of Corrections ("IDOC") during the time periods at issue, but who was later transferred to an Oregon prison. Renee Wood (hereafter "Plaintiff") is a former law firm paralegal who formed a romantic relationship with Lance Wood during her work on his behalf in a civil rights litigation. She later married Lance after he was transferred to Oregon.

Many of Plaintiff's current allegations are based upon state actors' alleged acts and omissions that occurred during Lance's prior civil rights litigation, *Wood v. IDOC*, Case No. 3:04-cv-00099-BLW. Chief Judge B. Lynn Winmill held a hearing in *Wood v. IDOC* on February 14, 2015, and made determinations on issues that are relevant to this action. However, there were no specific findings of fact made in *Wood v. IDOC*, and the Rules of Evidence were not applied. Therefore, the collateral estoppel effect of that case on this one may be limited. The Court notes only that much of the evidence presented in that case may be the same evidence that is presented in this case.

In her Second Amended Complaint, Plaintiff alleges that she began to work on prison reform in 2007. This work was based on the following:

- Plaintiff was told by current and ex-IDOC officials, prisoners and their families, that the in-crowd [of "top ranking IDOC, State and Federal officials"] expected IDOC officials to abide by a strict code of silence concerning their pattern of unlawful and unconstitutional practices ranging from: 1) nepotism; 2) cronyism; 3) misrepresenting IDOC funding to Idaho Legislators; 4) creating ghost jobs; 5) altering and destroying IDOC official and prisoner records; and 6) covering-up criminal and unconstitutional conduct by assaulting, retaliating, harassing, and threatening any citizens, IDOC officials, and prisoners that raise department or court complaints, or wants to be a witness against them.

- Plaintiff first met with Lance Wood at ISCI on October 18, 2012. Plaintiff learned that Mr. Wood shared in her desire for prison reform, and for the Balla Federal case to remedy decade old problems with inmate health care, and practices in the Idaho prisons that were not following departmental policies and procedures.

(Dkt. 21, p. 6 (verbatim).)

No specific facts about the foregoing allegations were included in the Second Amended Complaint. The Court asked Plaintiff to clarify these allegations in her Supplement. Plaintiff did not make any more specific allegations in her Supplement regarding the details of the alleged longstanding IDOC corruption that she was investigating prior to helping Lance with the prisoner civil rights case mentioned above, *Wood v. IDOC*, Case No. 3:04-cv-00099-BLW.

While still a paralegal and employee of her then-husband's law firm, McKenzie Law Offices, Plaintiff began working as Lance's own paralegal and employee in December of 2012. (Dkt. 21, p. 6.) Plaintiff alleges that Defendants became aware of her and Lance's relationship on December 30, 2012, but did nothing until about February

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 5**

2013, in the midst of the *Wood v. IDOC* trial, when they intercepted a "romantic and legal" letter sent under the guise of attorney-client privileged mail from Lance to Plaintiff.[1] In her Supplement, Plaintiff clarifies that she is alleging Defendants Panther, Kubinski, Reinke, and Blades conspired with each other to threaten Plaintiff and Lance into withdrawing the *Wood v. IDOC* lawsuit and not pursuing future litigation that would expose IDOC officials' corruption. Plaintiff particularly alleges that Panther sent an IDOC official to threaten Lance and Plaintiff that, if Lance did not dismiss his lawsuit and stop all planned litigation against IDOC officials, Panther would release the IDOC investigation report about Plaintiff and Lance's relationship to the press and bring felony charges against Plaintiff for practicing law without a license. (Dkt. 28.)

Plaintiff also alleges that these Defendants conspired to and did threaten Senator McKenzie, telling him that they would release information about Plaintiff and Lance's relationship to the press if Senator McKenzie did not tell Plaintiff to stop assisting Lance with his current litigation and to stop any future litigation against IDOC officials. (Dkt. 28.)

Plaintiff alleges that Defendants carried out their threats by leaking the information to the Associated Press and sending Ada County Sheriff's Department employee Matthew Buie (also a defendant) to investigate Plaintiff for practicing law

---

[1]    Prison officials contrarily asserted in *Wood v. IDOC* that, on February 5, 2013, an IDOC correctional officer opened and scanned a letter marked "Legal Mail" sent from Lance to Plaintiff that had been returned to the prison as undeliverable, as part of the prison's regular policy to regulate inmate communication and contraband. (*See* Dkt. 510, p. 13 in Case No. 3:04-cv-00099-BLW.) This letter is the one Plaintiff refers to as the "romantic and legal letter" in her Second Amended Complaint. (*See* Dkt. 21, p. 8, in this case.)

without a license. (Dkt. 28.) She also alleges that IDOC Investigator James Du Toit engaged in harassment by creating a false report that she and Lance planned to commit suicide and sent police officers to her home solely for the purpose of harassment.

Plaintiff alleges that, at the *Wood v. IDOC* hearing on February 14, 2013, Defendants presented false information about IDOC's visiting policy, mail policy, the letter, and their knowledge of the fact that Plaintiff was not a lawyer. Plaintiff also makes other general allegations that Defendants acted improperly in questioning her in and outside of court at the February 14, 2013 hearing. In addition, Plaintiff alleges she overheard IDOC officials questioning IDOC employee witnesses subpoenaed to trial to testify on Lance's behalf and overheard IDOC officials direct an IDOC employee, Defendant Alan Stewart, to go through all of Lance's legal documents when he returned to the prison. She alleges that, as a result of Stewart's and other IDOC employee acts, important evidence about Lance's current and future claims in Lance's legal files was lost.

### 3.  Review of Plaintiff Renee Wood's Claims

#### A.  *First Amendment General Freedom of Speech Claim*

Plaintiff alleges that Defendants violated her First Amendment right to free speech by preventing her from communicating with inmates in her various capacities. This is a potentially viable claim,  because "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," *Turner v. Safley*, 482 U.S. 78, 84

(1987), "nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the 'inside.'" *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989).

Most of the law developed in this area concerns written correspondence, but it can be analogized to all forms of communication between non-prisoners and prisoners. *See, generally, Jones v. North Carolina Prisoners' Labor Union, Inc*., 433 U.S. 119 (1977) (opining that the "invocation of the First Amendment, whether the asserted rights are speech or associational, does not change this analysis."); *Rowe v. Shake*, 196 F.3d 778, 783 (7th Cir. 1999) (holding that it is well-established that non-prisoners have a First Amendment right to communicate with prisoners); *see also Procunier v. Martinez*, 416 U.S. 396, 408-09 (1974), *overruled on other grounds by Thornburgh v. Abbott; Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005). "The government's unjustifiable interference with correspondence violates the First Amendment rights of both the recipient and the sender." *Rowe*, 196 F.3d at 783 (citing *Procunier*, 416 U.S. at 408–09).

However, First Amendment rights in the context of prison must be analyzed with "due regard for the 'inordinately difficult undertaking' of modern prison administration," by weighing the need for order and security against the rights of inmates and non-inmates who seek to communicate with each other. *Thornburgh v Abbott*, 490 U.S. at 407 (quoting Turner, 482 U.S. at 85). Though *Thornburgh v. Abbott* is a mail case, the same general principles can be applied to other non-prisoner to prisoner communications:

> In particular, we have been sensitive to the delicate balance
> that prison administrators must strike between the order and

security of the internal prison environment and the legitimate demands of those on the "outside" who seek to enter that environment, in person or through the written word. Many categories of noninmates seek access to prisons. Access is essential to lawyers and legal assistants representing prisoner clients, *see Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), to journalists seeking information about prison conditions, *see Pell v. Procunier, supra*, and to families and friends of prisoners who seek to sustain relationships with them, *see Procunier v. Martinez, supra*. All these claims to prison access undoubtedly are legitimate; yet prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison. Acknowledging the expertise of these officials and that the judiciary is "ill equipped" to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world. *Id*., at 404-405, 94 S.Ct. at 1807.

*Id*. at 407-08.

In *Thornburgh*, the Court further determined that the rights and interests of outsiders to mail correspondence and other materials to prisoners must be analyzed under *Turner v. Safley*, 482 U.S. 78, 89 (1987), which held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." In *Turner*, the Court examined a free speech issue in the context of prison officials prohibiting correspondence between inmates residing at different state institutions. The *Turner* court identified four factors to consider when determining whether a regulation is valid: (1) whether there is a "rational connection between the prison regulation and the legitimate governmental interest put

forward to justify it"; (2) whether "there are alternative means of exercising the right that remain open to prison inmates"; (3) what "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether "ready alternatives" at a "de minimis cost" exist, which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." 482 U.S. at 89-93 (internal quotation marks omitted).

The Court first considers whether Plaintiff has alleged sufficient facts to proceed on her general claim that her First Amendment right to communicate with inmates was violated. She alleges that Defendants prevented her—acting as Lance's paralegal and employee[2]—from communicating with Lance about his case and also "blocked Plaintiff from contacting all McKenzie Law current and potential clients in all IDOC prisons." (Dkt. 21, p. 13.) While it appears from *Wood v. IDOC* that adequate reasons for doing so on a temporary basis *may* have existed—that information is not contained in this record. Therefore, liberally construing the claim, the Court will permit Plaintiff to proceed on this claim against only those Defendants against whom Plaintiff has made allegations in the Supplement that they personally participated in the acts that are the subject of the claim: Defendants Panther, Kubinski, Reinke, and Blades.

---

[2]     Plaintiff is not claiming that she was an attorney, but that she was a paralegal for McKenzie Law Office, a paralegal for Lance, and an employee of Lance.

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 10**

### B. *First Amendment Political Speech, Retaliation, and Harassment Claims*

To state a claim that a government official "chilled" a person's First Amendment rights regarding political speech, the plaintiff "must provide evidence showing that [the defendant] 'deterred or chilled [the plaintiff's] political speech and such deterrence was a substantial or motivating factor in [the defendant's] conduct.'" *Menotti v. City of Seattle*, 409 F.3d 1113, 1155 (9th Cir. 2005) (quoting *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994)).

Where a claim alleging "retaliation" has been brought in non-employee cases, courts have relied on the following standard of law:

> [T]o establish a First Amendment retaliation claim against an ordinary citizen, [the plaintiffs] must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002); *see also Worrell v. Henry*, 219 F.3d 1197, 1212–13 (10th Cir. 2000) (setting forth a nearly identical test in a non-employee retaliation case); *Rayford v. Omura*, 400 F.Supp.2d 1223 (D. Hawai'i 2005) (discussing variations in standards regarding retaliation for and chilling of political free speech in non-employee context).

As to government officials' actions that may constitute harassment, the Due Process Clause of the Fourteenth Amendment protects ordinary citizens from arbitrary

law enforcement or government activity for the purpose of harassment and interference. *Benigni v. City of Hemet*, 879 F.2d 473, 478 (9th Cir. 1988). A plaintiff must show that excessive and unreasonable government conduct was intentionally directed toward the plaintiff for an illegitimate or unlawful purpose. *Id.*

Here, Plaintiff is alleging that she engaged in speech that was critical of the IDOC in Lance's civil rights lawsuit against IDOC officials and in activities that threatened to expose IDOC corruption. She alleges that, in response, the IDOC took several actions that could constitute retaliatory, speech-chilling, and harassing actions, such as Defendants Panther, Kubinski, Reinke, and Blades revealing her relationship with Lance to her husband and the press, and in other ways described herein above. She also alleges that IDOC Investigator James Du Toit harassed her by creating a false report that she and Lance planned to commit suicide and by sending police officers to her home to harass her.

Plaintiff will be permitted to proceed on a suppression of First Amendment political speech claim, a First/Fourteenth Amendment retaliation claim for the exercise of political speech, and a Fourteenth Amendment harassment claim against the Defendants she identified in the Supplement: Panther, Kubinski, Reinke, and Blades. She may also proceed on a Fourteenth Amendment harassment claim against Du Toit.

## 4. First Amendment Freedom of Association Claims

The United States Supreme Court has held that the First Amendment provides the freedom to associate in two contexts: (1) protecting the right of persons to enter into and

maintain certain "intimate human relationships" from undue government intrusion; and (2) protecting the at the right to associate with others for the purpose of engaging in expressive activities protected by the First Amendment (e.g., speech, assembly, petition for the redress of grievances, exercise of religion). *Roberts v. United States Jaycees*, 468 U.S. 609, 617–618 (1984).

However, "freedom of association is among the rights least compatible with incarceration." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). Some curtailment must be expected in the prison context. *Id.; Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002) (observing that loss of intimate association is part and parcel with confinement). Spouses and family members of prisoners do not have rights or privileges to visitation distinct from those of the inmate to which they are married or related. *Hill v. Washington State Dep't of Corrections*, 628 F. Supp. 2d 1250, 1263 (W.D. Wash. 2009); *Thornburgh*, 490 U.S. at 410 n.9.

A court need not determine the extent to which freedom of association survives incarceration if the regulation at issue bears a rational relationship to legitimate penological interests. *See Overton*, 539 U.S. at 132. Great deference must be shown to prison administrators "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hill*, 628 F.Supp.2d at 1263; *Bell v. Wolfish*, 441 U.S. 520, 547 (1979).

Liberally construing the Second Amendment Complaint with Supplement, the Court will permit Plaintiff to proceed with her claim of a violation of her right to freedom

of association with inmates and with Lance by Defendants Panther, Kubinski, Reinke, and Blades, to the extent her claim is not precluded by legitimate prison regulations.

### 5. First Amendment Mail Claims

In the Second Amended Complaint, Plaintiff asserts that all prison officials withheld and failed to return or deliver 14 to 16 letters she wrote to Lance. (Dkt. 21, p. 15.) She also separately alleges that prison officials withheld and failed to return or deliver 9 to 10 letters she sent Lance from January through March 2013. Plaintiff also asserts that prison officials delayed every letter from Plaintiff to Lance from January 1, 2013, to June 18, 2013, with the delay being two to three weeks. Plaintiff alleges that she wrote Lance a letter every day, and sometimes multiple times per day. She alleges that the letters were not determined to pose a security threat or violate IDOC policy and should not have been delayed or withheld.

Non-prisoners have a First Amendment right to correspond with prisoners. *See Thornburgh v. Abbott*, 490 U.S. at 407. The government's unjustifiable interference with correspondence violates the First Amendment rights of both the recipient and the sender. *Procunier*, 416 U.S. at 408–09. Allegations that mail delivery was delayed for an inordinate amount of time are sufficient to state a claim for violation of the First Amendment. *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996). However, a temporary delay in the delivery of mail resulting from a prison's security inspection does not violate a prisoner's First Amendment rights. *Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999).

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 14**

Plaintiff has not clearly linked her allegations of mail interference to any particular Defendants. The Court instructed Plaintiff that she could not proceed on blanket allegations against all Defendants, but needed to clarify in her Supplement who, in particular, allegedly interfered with her mail. She has not done so. Because she has failed to allege how any Defendant personally participated in the alleged constitutional violation, she cannot proceed on her mail interference claims.

### 6. Access to the Courts

Claims for denial of access to the courts may arise from the frustration or hindrance of "a litigating opportunity yet to be gained" (forward-looking access claim "to remove roadblocks to future litigation") or from the loss of a suit that cannot now be tried (backward-looking claim). *Christopher v. Harbury*, 536 U.S. 403, 412–15 (2002). To state an access-to-courts claim, a plaintiff must allege facts supporting three elements: (1) official acts that frustrated the inmate's litigation; (2) loss of a "nonfrivolous" or "arguable" underlying claim that is set forth in the Complaint, including the level of detail necessary "as if it were being independently pursued"; and (3) specific allegations showing that remedy sought in the access to courts claim is not otherwise available in a suit that otherwise could be brought. *Id*. at 415-17.

While Plaintiff has vaguely stated that she is involved in prison reform activities, she has identified no hindrance or loss of a particular nonfrivolous or arguable claim for which she has standing, nor has she described such a claim with sufficient specificity such that it could be independently pursued. She has also stated that her future case

consisted of those claims she is bringing here, and thus, she has not shown that she otherwise is without a remedy for the claims. Accordingly, Plaintiff cannot proceed on an access to courts claim.

### 7.   Conspiracy to Deprive Plaintiff of Her Rights

Plaintiff alleges that all Defendants were engaged in a conspiracy to violate her First Amendment rights as a citizen of the United States. However, conspiracy is not itself a constitutional tort under § 1983. *See Cassettari v. Nevada County, California*, 824 F.2d 735, 739 (9th Cir.1987) (holding that "the insufficiency of [] allegations to support a section 1983 violation precludes a conspiracy claim predicated upon the same allegations"); *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980) (holding that "mere proof of a conspiracy is insufficient to establish a section 1983 claim"). Therefore, Plaintiff's conspiracy allegations can be litigated within the context of each substantive civil rights claim upon which she has been permitted to proceed, but they do not amount to a separately pursuable claim.

### 8.   Remedies Requested

Plaintiff sues Defendants in their official and individual capacities. She may not proceed on her claims for injunctive relief for which she has no standing, such as requesting removal of negative items from Lance's prison files or protection of inmates from retaliation, harassment, and discrimination. She may not proceed on claims for monetary damages against these individuals in their official capacities, because such actions are barred by the Eleventh Amendment, but she may proceed on her claims for

monetary damages against Defendants in their individual capacities. *See Pena v. Gardner*, 976 F.2d 469, 472 (9th Cir. 1992), *as amended* (Oct. 9, 1992).

### 9.   Proper Defendants and Further Amendment

Vague and conclusory allegations of official participation in civil rights violations are not sufficient to state a claim under § 1983. *See Ivey v. Board of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982) and *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979) (To have liability under § 1983, a defendant must have personally participated in the act that violates the Constitution.) Rather, "[l]iability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1983) (there is no respondeat superior liability under § 1983).

In *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), the United States Court of Appeals for the Ninth Circuit clarified that a supervisory defendant may be held liable under § 1983 if there is "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id*. at 1207. Allegations sufficient to show a causal connection include: (1) "setting in motion a series of acts by others"; (2) "knowingly refus[ing] to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (3) failing to act or improperly acting in "the training, supervision, or control of his subordinates"; (4) "acquiesc[ing] in the constitutional deprivation"; or (5) engaging in "conduct that showed a reckless or callous indifference to the rights of others." *Id*. at 1207-08 (internal quotations and punctuation omitted).

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 17**

Plaintiff was specifically instructed in the Initial Review Order that she had to specify how each named Defendant personally participated in the alleged constitutional violations. Plaintiff simply peppered the entire Second Amended Complaint with the names of every Defendant, without showing what each did on what dates to violate her rights. Plaintiff clarified claims against Defendants Panther, Kubinski, Reinke, and Blades in the Supplement, but claims against all other remaining Defendants are too vague to permit her to proceed.

Plaintiff may provide additional allegations against any of the Defendants in a Third Amended Complaint, accompanied by a motion to amend. Additional facts pleaded must not be "merely consistent with a defendant's liability," but must allege facts showing a causal link between the act and motive and the constitutional violation alleged. *Iqbal*, 556 U.S. at 662(internal quotation marks omitted). For example, Plaintiff alleges that Defendant Buie, an employee of a completely different entity, was asked to investigate circumstances surrounding Plaintiff and Lance's relationship and to investigate whether Plaintiff could be deemed as practicing law without a license, as Judge Winmill questioned in the February 14, 2014 hearing in *Wood v. IDOC*. Plaintiff has not sufficiently alleged that Buie was not simply performing an investigation that he was requested to perform.

## 10. Conclusion

Under a liberal construction of the allegations in the Second Amended Complaint and Supplement, the Court will permit Plaintiff to proceed on only those claims against

**SUCCESSIVE REVIEW ORDER AND REASSIGNMENT ORDER - 18**

those Defendants as set forth above. She will be permitted to request leave to amend her pleadings if she discovers additional facts to support additional claims or Defendants.

The Court provides the following observations to help narrow and focus the litigation in this case. In the *Wood v. IDOC* case, the rights of Lance were front and center; here, Plaintiff's claims go one step beyond the concerns in that case and center on whether officials did more than enforce legitimate policies and instead infringed upon Plaintiff's (albeit limited) constitutional rights under the circumstances by "abusing governmental power, or employing it as an instrument of oppression." *See Davidson v. Cannon*, 474 U.S. 344, 348 (1986). Similarly, Plaintiff's claims may be cut off early in litigation by facts showing that absolute or qualified immunity should apply, *see, e.g., Bly-Magee v. California*, 236 F.3d 1014 (9th Cir. 2001); *Fry v. Melaragno*, 939 F.2d 832, 836-37 (9th Cir. 1991), or later in litigation by facts showing that her claims do not meet the *Turner v. Safley* standard.

The parties are expected to disclose all information and documentation relevant to the claims and defenses at issue. For example, Plaintiff shall disclose to Defendants all evidence and information supporting her claims of corruption of "top-ranking IDOC, state and federal officials", and Defendants shall disclose to Plaintiff all evidence and information related to their investigations into Plaintiff and Lance's activities.

Because Lance is still incarcerated, counsel for Defendants and Plaintiff are ordered to confer by telephone or in writing to determine whether any special rules should be implemented to protect the security and privacy interests of the parties. For

example, the parties may stipulate that Lance Wood can provide a signed, written release to the parties, so that his prison files can be accessed in this case. The parties may want to stipulate to a protective order that Plaintiff not share certain types of documents she obtains in this litigation with any prisoner, including Wood; or the parties may agree that certain documents are to be submitted in camera, only, with only a security or privilege log provided to the other party. If no stipulations can be reached, the Court will entertain reasonable requests for protective orders.

Because this Court has determined that Plaintiff Lance Wood should not be permitted to proceed at all and that Plaintiff Renee Wood cannot proceed against all of the named Defendants, and those non-appearing Defendants have no ability to engage in the consent to magistrate judge process, the Court will order the Clerk of Court to reassign this case by random draw to a United States District Judge. *See Williams v. King*, 875 F.3d 500 (9th Cir. 2017); 28 U.S.C. § 636(c). Plaintiffs shall have 21 days after entry of this Order in which to file a response to this Order. After that time period, the District Court will review the entire matter de novo to determine how the case should proceed, if at all.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff Renee Wood's separate Demand for Jury Trial (Dkt. 24) is considered incorporated into her Second Amended Complaint.

2. Plaintiff Renee Wood shall submit an updated income and expenses affidavit regarding her current in forma pauperis status within 21 days after entry of this Order. She shall specifically include her current income and assets information. After reviewing this information, the District Court will determine whether her in forma pauperis status shall continue, which affects service of process.

**IT IS RECOMMENDED that:**

1. Plaintiff Lance Wood's claims (in Dkt. 9) be dismissed without prejudice.

2. Plaintiff Renee Wood be permitted to proceed on her Second Amended Complaint (Dkt. 21) with Supplement (Dkt. 28) only as follows: (1) a First Amendment freedom of speech claim against Defendants Panther, Kubinski, Reinke, and Blades; (2) a suppression of First Amendment political speech claim, a First/Fourteenth Amendment retaliation claim for the exercise of political speech, and a Fourteenth Amendment harassment claim against Defendants Panther, Kubinski, Reinke, and Blades; (3) a Fourteenth Amendment harassment claim for the exercise of political speech against Defendant Du Toit; and (4) a First Amendment claim of violation of her right to freedom of association with inmates and with Lance by Defendants Panther, Kubinski, Reinke, and Blades, to the extent compatible with prison regulations.

DATED: December 22, 2017



_____

Honorable Candy W. Dale
United States Magistrate Judge

_____

Full Name

_____

_____

_____

Complete Mailing Address

_____

Daytime Telephone Number

Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

_____,

*(full name)*

             Plaintiff,

    v.

_____,

_____,

_____,

            Defendant(s).

Case No. _____

              *(to be assigned by the Court)*

**IN FORMA PAUPERIS APPLICATION**

*(nonprisoner)*

_____

     ***NOTICE***:  *By completing this Motion and Affidavit, I understand that I am requesting in forma pauperis status rather than paying the filing fee at the time of filing.  I understand that, if my request is granted, my fee will not be waived, but that I will be ordered to pay the full filing fee in increments until the filing fee is paid in full, even if my case is later dismissed.*

     ***INSTRUCTIONS***:  *Complete all questions in this application and then sign it. Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write in that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, the caption of your case, and the question number.*

1

## MOTION

I request that the Court allow me to proceed in forma pauperis in this action because I am unable to pay the filing fee at the time of filing as a result of my poverty.  I swear or affirm, under penalty of perjury, that the following information is true and correct to the best of my knowledge.

## AFFIDAVIT

1.  For both you and your spouse, estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property(such as rental income) | $ | $ | $ | $ |
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| | | | $_____ | $_____ |
| Child support | $ | $ | | |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $_____ | $_____ | $_____ | $_____ |
| Public-assistance(such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |

2

**Total monthly income:**          $                    $                    $                    $

2.  List your employment history, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|---|---|---|---|
| _____ | _____ | _____ | _____ |

3. List your spouse's employment history, most recent employer first. (Gross monthly pay is before taxes or other deductions.)

| Employer | Address | Dates of Employment | Gross monthly pay |
|---|---|---|---|
| _____ | _____ | _____ | _____ |
| _____ | _____ | _____ | _____ |

4.  How much cash do you and your spouse have? $_____Below, state any money you or your spouse have in bank accounts or other financial institution**.**

| Financial institution | Type of account | Amount you have | Amount your spouse has |
|---|---|---|---|
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |
| _____ | _____ | $_____ | $_____ |

5.  List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.

| Home ( Address and Value) | Other real estate (Address and Value) | Motor vehicle #1 (Value) |
|---|---|---|
|  |  | Make: |
| _____ | _____ | _____ |
| _____ | _____ | Year: |
| _____ | _____ | _____ |
| _____ | _____ | Model:_____ |

| Motor vehicle #2 (Value) | Other assets (item and value) | Other assets (item and value) |
|---|---|---|
| Make:_____ |  |  |
| Year: |  |  |
| Model:_____ | _____ | _____ |

3

_____   _____

6.  Does anyone owe you or your spouse money?  State the person's name and the amount owed.

_____

_____

_____


7.  State the persons who rely on you or your spouse for support.

**Name**                          **Relationship**                    **Age**

_____     _____     _____

_____     _____     _____

_____     _____     _____

8.  On the chart below, estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.

|  | **You** | **Your Spouse** |
|---|---|---|
| Rent or home-mortgage payment (include lot rented for mobile home) | $_____ | $_____ |
| Are real-estate taxes included?  Yes   No Is property insurance included? Yes   No | | |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $_____ | $_____ |
| Home maintenance (repairs and upkeep) | $_____ | $_____ |
| Food | $_____ | $_____ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $_____ | $_____ |
| Medical and dental expenses | $_____ | $_____ |
| Transportation (not including motor vehicle payments) | $_____ | $_____ |
| Recreation, entertainment, newspapers, magazines, etc. | $_____ | $_____ |
| Insurance (not deducted from wages or included in Mortgage payments) | $_____ | $_____ |
| Homeowner's or renter's | $ | $ |
| Life | $_____ | $_____ |
| Health | $_____ | $_____ |
| Motor Vehicle | $_____ | $_____ |
| Other: | $_____ | $_____ |
| Taxes (not deducted from wages or included in Mortgage payments) (specify):_____ | $_____ | $_____ |
| Car payment (creditor) | $ | $ |
| Credit card (name):_____ | $_____ | $_____ |

4

Credit card (name):_____ $_____ $_____

Department store (name):_____ $_____ $_____

Other:_____ $_____ $_____

Alimony, maintenance, and support paid to others $_____ $_____

Regular expenses for operation of business, profession, or farm (attach $_____ $_____
detailed statement)

Other (specify):_____ $_____ $_____

**Total monthly expenses**:$_____ $_____

9.  Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?   Yes    No    *(circle one)*

If yes, describe: _____

_____

10.  Have you paid, or will you be paying, an attorney, paralegal, document preparation service, or anyone else any money for services in connection with this case, including the completion of this form?  Yes  No    *(circle one)*   If yes, how much? $_____

If yes, state the attorney's or person's name, address, and telephone number:

_____

_____

11.  Provide any other information that will help explain why you cannot pay the filing fee.

_____

_____

_____

12.  Age: _____      Years of schooling: _____

        I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the filing fee in my case. I believe I am entitled to redress for the reasons set forth in my complaint. I swear or affirm under penalty of perjury under the laws of the United States of America that my answers on this form are true and correct. (*See* 28 U.S.C. §ç1746 and 18 U.S.C. §ç1621.)

        Executed this _____ day of _____, 20___.

                                        _____